## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA  DIVISION

| | |
|---|---|
| 6409 3rd Street ) | |
| Alexandria, Virginia 22310 ) | |
| ) | |
| *Plaintiff,* ) | **Civil Action No.: TBD** |
| ) | |
| v. ) | **JURY TRIAL DEMAND** |
| ) | |
| Delta Air Lines, Inc. ) | **COMPLAINT** |
| 1030 Delta Boulevard ) | |
| Atlanta, Georgia 30354-1989 ) | |
| ) | |
| *Defendant.* ) | |

### NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and Title I of the Civil Rights Act of 1991, to provided recourse for and correct unlawful employment practices on the basis of religion and to provide appropriate relief to Genet Lema, who was adversely affected by such practices. As alleged with greater particularity in the paragraphs below, the Plaintiff Genet Lema ("Plaintiff" or "Ms. Lema") alleges that Delta Air Lines, Inc. ("Defendant" or "Delta"), terminated Ms. Lema as a direct and proximate result of her religion, Islam, in violation of Title VII.

### JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) of ("Title VII") and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

1

## PARTIES

3. Plaintiff, Genet Lema, is a former Delta employee. During all times material, Ms. Lema worked and resided in Arlington and Alexandria, Virginia, respectively.

4. At all times material, Defendant has continuously been a Delaware corporation registered to conduct business in the Commonwealth of Virginia and has continuously been doing business in the Commonwealth of Virginia.

5. At all times material, Defendant has continuously had at least 15 employees.

6. At all times material, Defendant has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

## ADMINISTRATIVE PROCEDURES

7. On or about August 29, 2019, Ms. Lema submitted a Charge of Discrimination against the Defendant.

8. The EEOC issued a "right to sue" letter to Ms. Lema on or about December 3, 2020.

9. This lawsuit has been filed within 90 days of the right to sue.

10. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

11. As more fully described below, on or about March 31, 2019, Defendant engaged in unlawful employment practices by terminating Ms. Lema as a result of her religious beliefs.

12. Defendant terminated Ms. Lema under the pretextual veil of a customer dispute. Defendant's true basis for Ms. Lema's termination, however, was plainly revealed by its

disparate treatment of non-Muslim employees. Indeed, in two *nearly identical* (albeit more severe) alleged customer disputes, Defendant retained the non-Muslim employees. Compounding matters, overwhelming evidence indicates that Delta did not conduct any bona fide investigation into the allegations made by the customer – even failing to interview eyewitnesses and, on information and belief, review video evidence of the incident.

13. In contrast, with the non-Muslim employees, neither employee was terminated despite eyewitness testimony that expressly confirmed a physical altercation as well as the threat of physical harm to an airline passenger in the respective incidents.

14. In Ms. Lema's case, however, eye-witness testimony would have confirmed that she acted professionally throughout the incident with the unruly passenger. Moreover, video evidence obtained by Ms. Lema and provided to the EEOC would have further confirmed Ms. Lema's narrative of events.

15. In short, as more fully described below, Ms. Lema was terminated for alleged conduct (which did not in fact occur) that was far less egregious than conduct from two non-Muslim employees (which did in fact occur) who were retained by Delta.

16. Moreover, even prior to the incident, Ms. Lema's direct supervisor refused to let her complete mandatory training. The refusal to let Ms. Lema complete mandatory training as well as the Ms. Lema's ultimate termination took place less than two months after Ms. Lema confided in her supervisor that she was a practicing Muslim and would exercise her right to wear a hijab during the holy month of Ramadan.

17. As discussed in greater detail below, the timing of Ramadan plays a particularly important role in identifying that Ms. Lema's termination was directly related to her religion

and not the alleged incident.

18. In sum, Ms. Lema's termination violates Section 703 of Title VII, 42 U.S.C. § 2000(e)-2.

## MS. LEMA'S LONG CAREER AT DELTA

19. Prior to her termination, Ms. Lema was a highly regarded Delta employee. She had worked her way up the latter and took on greater and greater responsibilities since she began her employment in 2006 - more than 12 years before her termination.

20. During that time, Ms. Lema had no bona fide disciplinary issues whatsoever and generally received favorable marks on her performance reviews.

21. Indeed, most recently, in 2017, Ms. Lema was promoted to the position of a lead coordinator or "Redcoat" as it is known within Delta. As part of her Redcoat duties, Ms. Lema managed the gate operations at Washington National Airport for Delta. During that time, to the best of Ms. Lema's knowledge she did not have a single formal customer complaint.

## NEW DIRECT SUPERVISOR

22. On or about October 2018, Ms. Lema began reporting to Shelia Norwood ("Ms. Norwood") as her direct supervisor. Over the years, Ms. Lema had many different direct supervisors, however, had excelled under each respective leadership — ultimately landing her in lead coordinator role.

23. Given that Ms. Norwood was a new supervisor to Ms. Lema, Ms. Lema consistently tried to put her "best foot forward" when Ms. Norwood was present. This often led to Ms. Lema making concerted efforts to engage Ms. Norwood in conversation whenever possible.

24. This "small talk" by Ms. Lema was an effort to get to know her supervisor better

and show Ms. Norwood that Ms. Lema was a responsible lead coordinator who could excel at her position.

25. During one conversation on or about December of 2018, Ms. Lema mentioned that timing of Ramadan in the new year (2019). In this discussion, Ms. Lema said that during Ramadan she wears a hijab.

26. Ms. Lema ordinarily did not wear a hijab but did so for the month-long celebration of Ramadan when she fasted during daylight hours. Because Ms. Lema and Ms. Norwood had not met before she became Ms. Lema's supervisor (Ms. Norwood transferred from New York in 2018), Ms. Norwood had never seen Ms. Lema in a hijab before.

27. Initially, when Ms. Norwood heard this, she laughed and did not believe that Ms. Lema was a Muslim. Perplexed by Ms. Norwood's response, Ms. Lema replied that she was not "kidding" about being a Muslim or wearing hijab during the holy month.

28. In response, Ms. Norwood was again dismissive as if Ms. Lema could not be serious about being a Muslim or choosing to wear a hijab.

29. From that point on, Ms. Norwood's behavior towards Ms. Lema changed markedly and she became much more distant. Even more remarkably, thereafter Ms. Norwood repeatedly refused to let Ms. Lema attend Delta training programs, including *mandatory* programs.

30. For example, all Redcoats were required to take a training program called "link to lead." Ms. Lema repeatedly asked Ms. Norwood when Ms. Lema could take the course.

31. In response, Ms. Norwood would never provide a time for Ms. Lema to take the course. Worse yet, Ms. Norwood was generally dismissive and frustrated when Ms. Lema informed her the training was mandatory and Ms. Lema must take it.

32. The training was generally supposed to be completed no later than February 2019. As discussed in more detail below, even by late March, at the time of her pretextual and unlawful termination, Ms. Norwood still had refused to let Ms. Lema take the training or provide a definite date when the training could occur.

## **PRETEXTUAL AND UNLAWFUL TERMINATION**

33. On March 31, 2019, Ms. Lema was working as a Redcoat at Gate 17. The gate was busy that afternoon.

34. At approximately 4:30 p.m., prior to beginning the boarding processes for a flight headed to JFK airport, a passenger (the "Passenger") was concerned that she would not make a connecting flight.

35. The Passenger also informed Ms. Lema that she had an injured knee and would require assistance. Ms. Lema readily informed the Passenger that Ms. Lema understood and would ensure that a wheelchair and attendant would be available upon her arrival to JFK.

36. The Passenger, seemingly unsatisfied with a wheelchair, insisted that a cart had already been ordered for her; however, as Ms. Lema explained, in some cases, the carts do not wait for specific passengers.

37. To be sure she had a reliable escort, Ms. Lema suggested that a wheelchair and attendant would likely be the better option given that the wheelchair attendants were required to wait for the Passenger until her arrival at JFK.

38. Ms. Lema went on to reiterate that if the cart was there when she arrived, the Passenger could always use the cart and decline the wheelchair; however, if the cart was not there, the wheelchair could be her fallback option.

39. The Passenger became angry that Ms. Lema could not promise a cart would be

available upon her arrival to JFK and the Passenger then demanded to know her name so that she could inform someone she knew in Delta management. Ms. Lema provided her full name in response to her request.

40. Thereafter, the Passenger walked a short distance away and began filming the gate desk. She appeared to be videoing the front gate agents, including Ms. Lema, and the surrounding passengers.

41. Pursuant to established Delta policy and her training, Ms. Lema informed her that she cannot film the gate agents and passengers without their consent; however, the Passenger refused to stop. After stating this Ms. Lema walked away from the Passenger in an effort to deescalate the matter.

42. Shortly thereafter, Ms. Lema began the boarding process and began to scan tickets to admit the waiting passengers. Per Delta's policy, Ms. Lema asked all those with disabilities to pre-board the plane. Due to her alleged knee injury, the Passenger who Ms. Lema had spoken with previously, was first in line to board the plane.

43. As Ms. Lema scanned her ticket, the Passenger began to threaten Ms. Lema and stated that "you will not have a job tomorrow" and that she "[the Passenger] knows people in [Delta] upper management."

44. Ms. Lema acknowledged the Passenger's statements and attempted to continue the boarding process. Despite scanning her ticket and asking the Passenger to board, the Passenger only walked a short distance to the jetway and then turned around stood at the entrance of the jetway.

45. The Passenger then began to film Ms. Lema and other Delta employees from behind the gate. By this time, Ms. Lema had already scanned the ticket for a wheelchair-bound

passenger who was then attempting to proceed down the jetway to the plane.

46. Because the Passenger was blocking the gate entrance, however, the wheelchair-bound passenger could not proceed to the plane. Once Ms. Lema noticed this issue, Ms. Lema walked to the jetway and asked the Passenger to please board the plane.

47. This entire interaction was witnessed up close by the wheelchair attendant, a Delta contractor (from Euline America, Inc.), who name is Seyefe Sine ("Mr. Sine"), who was waiting to push a wheelchair-bound passenger down the jetway.

48. The wheelchair-bound passenger would also have witnessed the entire interaction. Indeed, the wheelchair-bound passenger could not be pushed down the jetway until the Passenger either boarded the plane or stopped blocking the path to the plane.

49. During this time, Ms. Lema repeatedly asked the Passenger to stop filming and board the plane. Eventually the Passenger turned and boarded the plane and the wheelchair-bound passenger followed.

50. It is important to remember that this entire process was unfolding while the boarding process was beginning on an already delayed flight. As a result, there were passengers as well as Delta employees that were eagerly awaiting access to the jetway.

51. After the Passenger finally proceeded down the jetway and boarded the plane, Ms. Lema hurried back to the desk to continue assisting with boarding the passengers who were waiting to board the flight.

52. A short time later, Ms. Lema received a call from Delta operations who asked that Ms. Lema, as a designated Ground Security Coordinator, come speak with the pilot about an alleged security matter.

53. At the time, Ms. Lema had no idea what the security matter could be. Ms. Lema

spoke with the pilot who indicated that the same Passenger who was improperly filming and obstructing the jetway was now asserting that Ms. Lema had hit her in the jetway.

54. Ms. Lema was shocked by the accusation as Ms. Lema knew it to be untrue and that there were witnesses that could verify it did not occur. Nevertheless, appropriate steps were taken to summon the airport police to address the allegation.

55. A short time later, the airport police arrived, and Ms. Lema greeted them at the gate. Thereafter, the police proceeded to the jetway and spoke with the Passenger who initially reaffirmed her accusations.

56. When pressed and asked to make a sworn statement for charges; however, the Passenger was unwilling to move forward. When the police spoke with Ms. Lema, Ms. Lema informed them that she had not in any way touched the Passenger and that numerous eyewitnesses could support her account.

57. Thereafter, because no charges were filed and the fact that Ms. Lema disputed her account (and supported her position with reference to the available eyewitnesses), the police left without even asking either party to sign an incident report.

58. Ms. Lema then informed her manager, Ms. Norwood, of what had occurred. Ms. Lema also told her of the available eyewitnesses and that the video recordings would support her account.

59. Ms. Norwood promised to interview the witnesses and review the videotape. It seems, however, that she did neither.

60. Later that night at approximately 11pm, Ms. Lema learned from Ms. Norwood, that despite the existence of both a video footage and eyewitnesses that could conclusively establish that Ms. Lema did not touch the Passenger, Ms. Norwood, on behalf of Delta, was

9

suspending Ms. Lema indefinitely.

61. Despite the significance of suspending an employee indefinite, no other Delta employees where present when Ms. Norwood informed Ms. Lema she was going to be suspended indefinitely. Indeed, to Ms. Lema's knowledge, suspending an employee without others present violates Delta's policy, which generally require at least two managers for suspending and/or termination decisions.

62. Although Delta never sent Ms. Lema a formal termination letter, this indefinite suspension eventually turned into a de facto termination.

63. Remarkably, prior to her suspension and subsequent termination, Ms. Lema was never formally interviewed about the incident by Delta management, nor did Ms. Lema speak with any one in management about the issue other than Ms. Norwood.

64. Even more remarkably, on information and belief prior to Ms. Lema's termination, none of the eyewitnesses, including Mr. Sine, were interviewed. Similar, at the time that Ms. Lema obtained the video tape of the incident from security, she was told that neither Ms. Norwood (or anyone at Delta) had ever requested or reviewed the video tape of the matter.

**OBJECTIVE DISPARATE TREATMENT FOR NON-MUSLIM EMPLOYEES**

65. Both before and after Ms. Lema's termination, two significantly worse incidents took place between Delta employees and passengers; however, those employees, who were non-Muslim, were not terminated.

66. On April 26, 2019, just a few days after Ms. Lema's de facto termination, a Delta employee, Yonathan Alemseged, who was also a Redcoat, allegedly struck a woman. The alleged physical altercation was reported to Delta management by a Delta employee who said

he personally witnessed Mr. Alemseged strike the passenger. After the incident was reported, Mr. Alemseged was not terminated from his position. Mr. Alemseged is not a Muslim.

67. Additionally, before Ms. Lema's termination, a Delta employee named Antanae Horton, also a non-Muslim employee, had a heated argument with a passenger. Eventually during this argument Antanae Horton told the passenger that she wanted to "fight her" outside. This incident was reported to Delta management by Delta employee Alberto Flores. Antanae was not terminated from her position.

68. In stark contrast to these two incidents (where physical assault either occurred or was threatened to occur), Ms. Lema was immediately suspended and, later terminated, despite the existence of both eyewitness and videotape evidence plainly showing that Ms. Lema did not strike the Delta passenger.

69. Additionally, in obtaining additional information prior to filing this lawsuit, Ms. Lema has been informed by her former Delta colleagues and related contractors, including the eyewitnesses, that they were not interviewed by Delta prior to Ms. Lema's termination.

70. Indeed, its quite clear that Delta had no interest in getting to the truth and instead wished to use a completely false incident as a pretext for terminating Ms. Lema.

71. Ms. Lema was the only Muslim lead coordinator that reported to Ms. Norwood (and, on information and belief, the only Muslim lead coordinator working at Washington National Airport).

## IMPACT ON MS. LEMA'S LIFE

72. Delta's actions have taken a great toll on Ms. Lema. Ms. Lema chose to work at Delta in large part because of the travel benefits that would enable Ms. Lema to visit her elderly mother in Atlanta, Georgia.

73. Now that Ms. Lema has been terminated, Ms. Lema cannot afford to travel to Atlanta to take care of her mother on a regular basis, as Ms. Lema did before.

74. Additionally, due to the nature of her termination, Ms. Lema have been unable to find a job at or near her former Delta salary.

75. Accordingly, Ms. Lema has experienced, among other things, substantial emotional distress, and economic damages.

## COUNT ONE:
### Wrongful Termination in Violation of Title VII, 42 U.S.C. § 2000(e) *et. seq.*

76. The allegations of the foregoing paragraphs are incorporated as though fully set forth herein.

77. Ms. Lema's devout Muslim faith makes her a member of a protected class.

78. At all times material, Ms. Lema was and remains a member of the protected class.

79. Defendant discriminated against Ms. Lema by discharging her for pretextual reasons. The actual basis for Ms. Lema's termination was because she was a member of a protected class, a practicing Muslim.

80. Prior to her termination, Ms. Lema was a model employee for Delta for over twelve years. In that time, she climbed the latter and gained greater and greater responsibilities.

81. Despite undisputedly exceling in her position for 12 years, within a short period of time after informing her supervisor that she was a practicing Muslim, Ms. Lema was terminated.

82. Even before Ms. Lema was terminated for the pretextual customer dispute, after Ms. Norwood learned of Ms. Lema's religious faith, Ms. Lema's supervisor refused to let her complete even mandatory trainings.

83. As addressed above, in March of 2019, Ms. Lema professionally and courteously

12

handled an incident with a frustrated and threatening passenger.

84.     Despite Ms. Lema's professional actions, the Passenger became increasingly irritated and eventually stood blocking the jet bridge.

85.     Again, Ms. Lema calmly and professionally addressed the situation and eventually the passenger left the jet bridge. Ms. Lema's interaction with the Passenger on the jet bridge was directly witnessed by Ms. Sines and his wheelchair bound passenger. Neither Ms. Norwood nor anyone else at Delta interviewed Mr. Sines. Likewise, on information and belief, Ms. Norwood nor anyone else at Delta interviewed the wheelchair bound passenger.

86.     Furthermore, the interaction was also largely caught on the airport's security cameras; however, on information and belief, neither Ms. Norwood nor Delta reviewed the footage prior to suspending and/or terminating Ms. Lema.

87.     Instead, Ms. Norwood disregarded the plain evidence and used the incident as a pretextual means of terminating Ms. Lema.

88.     In reality, the reason Ms. Lema was terminated was a direct and proximate result of Ms. Norwood's knowledge that Ms. Lema was a practicing and devout Muslim.

89.     This basis is further illustrated by Delta's failure to terminate two non-Muslim employees for similar (albeit even more severe) alleged conduct.

90.     Defendants' actions violate Title VII, 42 U.S.C. § 2000e.

91.     As a result of the Defendant's wrongful termination of Ms. Lema, Ms. Lema has suffered economic damages as well as other damages including emotional distress, damage to her reputation, loss of employment benefits, anxiety, humiliation, and loss of enjoyment of life as well as termination of her employment.

92. Defendant's conduct was pursued in knowing and/or reckless disregard for the rights of Ms. Lema and other and therefore warrants the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff compensatory damages in an amount to be determined by the jury;

B. Award Plaintiff her reasonable costs and expenses incurred in this action, including attorneys' fees;

C. Order equitable relief including but not limited to backpay and front pay; and

D. Enter such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Ms. Lema hereby demands a trial by jury with respect to each claim in this Complaint.

Respectfully submitted,

Ian A. Cronogue, Esq.
Baker, Cronogue, Tolle & Werfel, LLP
1320 Old Chain Bridge Road, Suite 200
McLean, Virginia 22101
Phone: 703.448.1810, ext. 22
*iancronogue@bctwlaw.com*
Counsel for Plaintiff